**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Stephen Hunter

    v.                                      Case No. 15-cv-421-PB

Carolyn W. Colvin, Acting
Commissioner, Social
Security Administration

**REPORT AND RECOMMENDATION**

Pursuant to 42 U.S.C. § 405(g), Stephen Hunter moves for an order reversing the Acting Commissioner's decision to deny his applications for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, or SSI, under Title XVI, 42 U.S.C. § 1382. The Acting Commissioner, in turn, moves for an order affirming her decision. For the reasons that follow, this matter should be remanded to the Acting Commissioner.

## I.  **Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of

> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB
decisions); see also 42 U.S.C. § 1383(c)(3) (establishing §
405(g) as the standard of review for SSI decisions).  However,
the court "must uphold a denial of social security . . .
benefits unless 'the [Acting Commissioner] has committed a legal
or factual error in evaluating a particular claim.'"  Manso-
Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per
curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

     As for the statutory requirement that the Acting
Commissioner's findings of fact be supported by substantial
evidence, "[t]he substantial evidence test applies not only to
findings of basic evidentiary facts, but also to inferences and
conclusions drawn from such facts."  Alexandrou v. Sullivan, 764
F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner,
360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial
evidence is 'more than [a] mere scintilla.  It means such
relevant evidence as a reasonable mind might accept as adequate
to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d
594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402
U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the
[Acting Commissioner] to determine issues of credibility and to

draw inferences from the record evidence.  Indeed, the
resolution of conflicts in the evidence is for the [Acting
Commissioner], not the courts."  Irlanda Ortiz v. Sec'y of HHS,
955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations
omitted).  Moreover, the court "must uphold the [Acting
Commissioner's] conclusion, even if the record arguably could
justify a different conclusion, so long as it is supported by
substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529,
535 (1st Cir. 1988) (per curiam).  Finally, when determining
whether a decision of the Acting Commissioner is supported by
substantial evidence, the court must "review[] the evidence in
the record as a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting
Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).


## II.  **Background**

     The parties have submitted a Joint Statement of Material
Facts.  That statement, document no. 12, is part of the court's
record and will be summarized here, rather than repeated in
full.

     In February of 2012, Hunter was hospitalized for three
days.  His hospitalization resulted from complaints of abdominal
pain and a rash that covered his right ankle, hips, wrists, and
arms.  He was discharged with a diagnosis of leukocystoclastic

vasculitis,[1] secondary to a virally mediated gastroenteritis.  In
May and June of 2012, Hunter received diagnoses of Henoch-
Schönlein purpura ("HSP")[2] and mild crescentic IgA nephropathy
with normal renal function.[3]  He last worked in May of 2012.
Regarding the end of his employment, a medical note generated
upon about six months later, upon a hospital admission for
psychiatric issues, reports:

> After a successful career in business, the patient was
> diagnosed about 8 months ago with vasculitis and
> subsequently with IGA nephropathy.  As he missed many
> days of work at his then-employer, Sears Roebuck,
> where he was the cashier lead person, he was relieved
> of his job responsibilities.

Administrative Transcript (hereinafter "Tr.") 2002.

Hunter applied for DIB and SSI in June of 2012, claiming to
have become disabled on June 2, 2012.  In support of his
applications, he submitted a Function Report in which he

---

[1] Leukocystoclastic vasculitis is "characterized clinically
by palpable purpura, especially of the legs . . . [and] may be
limited to the skin or involve other tissues as in Henoch-
Schönlein purpura." Stedman's Medical Dictionary 2092 (28th ed.
2006).  Purpura is "[a] condition characterized by hemorrhage
into the skin." Id. at 1606.

[2] Henoch-Schönlein purpura is "an eruption of non-
thrombocytopenic palpable purple lesions due to dermal
leukocytoclastic vasculitis with IgA in vessel walls associated
with joint pain and swelling, colic, and bloody stools . . . ."
Stedman's, supra note 1, at 1606.

[3] Nephropathy is "[a]ny disease of the kidney."  Stedman's,
supra note 1, at 1291.

described his daily activities this way:

> Wake up, eat breakfast, take morning meds, usually
> fall asleep, wake up[,] eat lunch[,] watch TV, fall
> asleep, eat dinner, walk dogs[,] watch TV[,] take
> night meds[,] go to bed.

Tr. 1845.  Hunter also indicated that he: (1) fed and walked two
dogs with help from his fiancée; (2) spent 20 minutes a day
preparing leftovers or sandwiches; and (3) spent 20 or 30
minutes, "a couple of times each week," doing laundry or
cleaning.  With regard to his general energy level, he reported:
(1) "being on medication[,] I am always exhausted and don't even
want to get out of bed on most days," Tr. 1844; (2) "I am
constantly sleeping," Tr. 1845; and (3) "I do much more watching
soccer [on television] and less time gardening and fishing since
I am usually too tired to go out," Tr. 1848.  In response to the
question "[h]ow well do you handle stress," Hunter responded
"handle stress well," and in response to the question "[h]ow
well do you handle changes in routine," he responded "handle
changes well."  Tr. 1850.

    After Hunter applied for SSI and DIB, a non-examining state
agency consultant, Dr. Jonathan Jaffe, reviewed Hunter's medical
records to assess his physical residual functional capacity
("RFC").[4]  According to Dr. Jaffe, Hunter's RFC was sufficient to

---

[4] "Residual functional capacity" is a term of art that means
"the most [a claimant] can still do despite his limitations."

satisfy the exertional demands of medium work, as defined by 20 C.F.R. §§ 404.1567(c) and 416.967(c).

In September of 2012, the Social Security Administration ("SSA") referred Hunter to Dr. Mark Ciocca, a psychologist, for a consultative examination.  Based upon the results of that examination, Dr. Ciocca completed a Mental Health Evaluation Report on Hunter.  Dr. Ciocca indicated a diagnosis of bipolar disorder.  With respect to Hunter's current level of functioning, Dr. Ciocca offered several opinions, including these:

> The claimant is unable to maintain attention and concentration in order to persist at, and complete tasks.
>
> . . . .
>
> Mr. Hunter is currently unable to tolerate stressors common to the work situation, and to maintain consistent attendance.

Tr. 1984-85.  Finally, Dr. Ciocca gave the following prognosis: "Given the stressor that Mr. Hunter's illness creates, it seems that he will have mood difficulties for the foreseeable future. Therefore, his prognosis is only fair."  Tr. 1985.

After Dr. Ciocca performed his consultative examination, a non-examining state agency psychological consultant, Dr. Therese Harris, reviewed Hunter's medical records, including Dr.

---

20 C.F.R. §§ 404.1545(a)(1) & 416.945(a)(1).

Ciocca's evaluation, and assessed his mental RFC.  According to

Dr. Harris, Hunter had some understanding and memory limitations

and some sustained concentration and persistence limitations,

but no limitations in the areas of social interaction and

adaptation.  With respect to understanding and memory, Dr.

Harris opined that Hunter had "[s]ome forgetfulness/ memory

limitations, but [was] able to recall and manage simple tasks."

Tr. 1696, 1709.  With respect to sustained concentration and

persistence limitations, Dr. Harris opined that Hunter had

"[s]ome difficulties with focus and concentration, but [was]

able to maintain focus, pace, and persistence for simple tasks

for 2-hour periods within a normal 40-hour work schedule."  Tr.

1696, 1709.

Then, after noting that Dr. Ciocca's opinion included more

restrictive limitations than those in her opinion, Dr. Harris

explained:

> [Dr. Ciocca's] statement of limitations is not
> consistent with the [claimant's] presentation at [Dr.
> Ciocca's examination] and is difficult to explain
> unless it reflects limitations due to BOTH the
> [claimant's] somatic issues and [psychological]
> issues.  These statements are therefore given limited
> weight.  [Dr. Ciocca] notes [claimant] is unable to
> tolerate stress, but the [claimant] himself states on
> his Functional Report that he manages stress well.
> Fully credible.

Tr. 1697 (emphasis added).

In November of 2012, after Drs. Ciocca and Harris assessed his physical and mental RFCs, Hunter was voluntarily admitted to the inpatient psychiatric unit at Concord Hospital for approximately 10 days because he was having suicidal thoughts. At Concord Hospital, he was diagnosed with major depressive disorder.  On admission, he had a global assessment of functioning ("GAF")[5] score of 32,[6] and at discharge, he had a GAF of 56.[7]  In December of 2012, Hunter spent five days in the Behavioral Health Unit of Southern New Hampshire Medical Center

---

[5] "GAF . . . provides a means for mental health professionals 'to turn raw medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning.'"  Phaneuf v. Colvin, No. 13-cv-139-LM, 2014 WL 2864727, at *2 n.3 (D.N.H. June 24, 2014) (quoting Gonzalez-Rodriguez v. Barnhart, 111 F. App'x 23, 25 (1st Cir. 2004); citing American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000)).

[6] "A GAF score of 31-40 indicates '[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).'"  Brindley v. Colvin, No. 14-cv-548-PB, 2016 WL 355477, at *3 n.2 (D.N.H. Jan. 29, 2016) (citation to the record omitted).

[7] "A GAF score of 51 to 60 represents moderate symptoms." Phaneuf, 2014 WL 2864727, at *2 n.3 (citing Jones v. Astrue, No. 1:10-cv-179-JAW, 2011 WL 1253891, at *3 n.4 (D. Me. Mar. 30, 2011)).

("SNHMC") as a result of compelling homicidal ideation.  At SNHMC, he was diagnosed with bipolar disorder, recurrent, mixed. On admission, he had a GAF of 35, and at discharge, he had a GAF of 50.[8]

After he was released from Concord Hospital, Hunter received five sessions of mental health counseling, over the course of approximately two months, from Sheena Bice.  Upon her initial examination, Bice gave Hunter preliminary diagnoses of mood disorder and impulse disorder, and gave rule-out diagnoses of bipolar disorder and intermittent explosive disorder.[9]  She also assessed Hunter as having a GAF of 50.

After the SSA denied Hunter's application for benefits, he received a hearing before an Administrative Law Judge ("ALJ"). Thereafter, the ALJ issued a decision that includes the following relevant findings of fact and conclusions of law:

---

[8] "A GAF score between 41 and 50 indicates '[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" Brindley, 2016 WL 355477, at *3 n.2 (citation to the record omitted).

[9] "'Rule-out' in a medical record means that the disorder is suspected but not confirmed — i.e., there is evidence that the criteria for a diagnosis may be met, but more information is needed in order to rule it out." Byes v. Astrue, 687 F.3d 913, 916 n.3 (8th Cir. 2012) (citing United States v. Grape, 549 F.3d 591, 593 n.2 (3d Cir. 2008)).

3.   The claimant has the following severe impairments: Henoch-Schonlein purpura/vasculitis, IgA nephropathy (glomerulonephritis), and bipolar disorder (20 CFR 404.1520(c) and 416.920(c)).

. . . .

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . . .

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), meaning he can lift and carry 50 lbs. occasionally and 25 lbs. frequently, stand or walk for 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday. The claimant has the ability to focus, persist, and keep pace in the performance of simple tasks, meaning one-to-three step workplace tasks.

. . . .

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . . .

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

Tr. 1658, 1660, 1664.  Based upon his assessment of Hunter's

RFC, and a hypothetical question posed to a vocational expert

that incorporated the RFC recited above, the ALJ determined that

Hunter was able to perform the jobs of night janitor, hand packager, and order picker.

## III. <u>Discussion</u>

### A.   <u>The Legal Framework</u>

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets.  42 U.S.C. § 1382(a).  The question in this case is whether the ALJ correctly determined that Hunter was not under a disability from June 2, 2012, through March 11, 2014, which is the date of the his decision.

To decide whether a claimant is disabled for the purpose of determining eligibility for either DIB or SSI benefits, an ALJ is required to employ a five-step process.  See 20 C.F.R. §§ 404.1520 (DIB) & 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is

granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920).

The claimant bears the burden of proving that he is disabled. See Bowen v. Yuckert, 482 U.S. 137, 146 (1987). He must do so by a preponderance of the evidence. See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)). Finally,

[i]n assessing a disability claim, the [Acting Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) [claimant]'s subjective claims of pain and disability as supported by the testimony of the [claimant] or other witness; and (3) the [claimant]'s educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

**B.   Hunter's Claims**

Hunter claims that the ALJ erred by: (1) failing to determine that his Henoch-Schönlein purpura met or medically equaled the severity of the listing for systemic vasculitis, i.e., Listing 14.03; (2) assigning him an RFC that was not

supported by substantial evidence; and (3) making a flawed
credibility assessment.  Hunter's first two arguments are both
meritorious.

    1.   Step Three

To show that an impairment meets Listing 14.03, a claimant
must demonstrate certain clinical findings[10] that are accompanied
by:

> A. Involvement of two or more organs/body systems,
> with:
>
> 1. One of the organs/body systems involved to at
> least a moderate level of severity; and
>
> 2. At least two of the constitutional symptoms or
> signs (severe fatigue, fever, malaise, or involuntary
> weight loss).
>
> or
>
> B. Repeated manifestations of systemic vasculitis,
> with at least two of the constitutional symptoms or
> signs (severe fatigue, fever, malaise, or involuntary
> weight loss) and one of the following at the marked
> level:
>
> 1. Limitation of activities of daily living.
>
> 2. Limitation in maintaining social functioning.

---

[10] It appears to be undisputed that Hunter has demonstrated
the requisite clinical findings.  The applicable regulation
provides that "tissue biopsy confirms a diagnosis of systemic
vasculitis," 20 C.F.R., Pt. 404, Subpt. P., App. 1, 14.00D.2.b.
In his RFC assessment, Dr. Jaffe noted: "there is Henoch-
Schonlein purpura, biopsy proven proliferative
glomerulonephritis."  Tr. 1695.

> 3. Limitation in completing tasks in a timely manner
> due to deficiencies in concentration, persistence, or
> pace.

20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 14.03.

In his decision, the ALJ gave the following explanation for

his determination that Hunter had not established that his HSP

met Listing 14.03:

> although the claimant complains of fatigue, malaise,
> and weight loss, the evidence establishes [that] these
> symptoms are not particularly severe, as evidenced by
> the claimant's previous ability to work at SGA
> [substantial gainful activity] levels, and his robust
> level of activities (See, e.g., Exhibit 5E [i.e., the
> Function Report quoted above]), and it is not clear
> from the evidence that the claimant's vasculitis is
> such that it involves two or more organs, or body
> systems, with the involvement of one of the organs or
> body systems being to at least a moderate level of
> severity.  Further, the claimant's symptoms have not
> caused him to suffer marked limitations in the
> performance of his activities of daily living, his
> social functioning, or his ability to complete tasks
> in a timely manner because of deficiencies in
> concentration, persistence and pace.

Tr. 1658-59.  The Acting Commissioner defends the ALJ's finding

by pointing out that Dr. Jaffe found that Hunter's HSP did not

meet Listing 14.03, and that the record includes no medical

opinion that Hunter's HSP did meet Listing 14.03.

While the Acting Commissioner relies upon Dr. Jaffe's

determination that Hunter's HSP did not meet Listing 14.03, the

ALJ did not mention Dr. Jaffe's determination, and it is not for

the Acting Commissioner, or the court, to fashion rationales for

the ALJ that the ALJ did not articulate.  See Haggblad v.
Astrue, No. 11-cv-028-JL, 2011 WL 6056889, at *13 (D.N.H. Nov.
17, 2011), R & R adopted by 2011 WL 6057750 (Dec. 6, 2011)
(citing High v. Astrue, No. 10-cv-69-JD, 2011 WL 941572, at *6
(D.N.H. Mar. 17, 2011); Dube v. Astrue, No. 1:10-cv-179-JL, 2011
WL 742520, at *6 n.15 (D.N.H. Feb. 24, 2011); Laplume v. Astrue,
No. 08-cv-476-PB, 2009 WL 2242680, at *6 n.20 (D.N.H. July 24,
2009) ("I cannot uphold the ALJ's decision based on rationales
unarticulated in the record.")).  That leaves for the court's
analysis the rationale the ALJ did give.  That rationale is not
supported by substantial evidence.

     First, the ALJ says that "it is not clear from the evidence
that the claimant's vasculitis is such that it involves two or
more organs, or body systems, with the involvement of one of the
organs or body systems being to at least a moderate level of
severity."  Tr. 1659.  Regarding the involvement of two or more
organs or body systems, Dr. Jaffe noted that Hunter's "kidney
biopsy showed diffuse proliferative glomerulonephritis," Tr.
1695, and that Hunter "has continued to have skin rash," id.
Hunter's kidney and skin count as two organs or body systems.
As for severity, on May 17, 2012, Dr. Eugene Kissin, a treating
rheumatologist, wrote:

     Mr. Hunter has an unusual leukocytoclastic vasculitis
     that involves [a] very large surface area of skin more

15

> extensive than what is usually seen.  He also did not
> respond to two courses of prednisone which is unusual
> for leukocytoclastic vasculitis.

Tr. 1910.  On June 7, 2012, Dr. Ramon Bonegio, another treating

physician, called Hunter's skin rash "the most diffuse and

persistent rash that [he had] seen in an adult."  Tr. 1890.  The

rash that Drs. Kissin and Bonegio described certainly

demonstrates involvement of a body system that is at least

moderately severe.  Because the ALJ points to no contrary

evidence, but relies exclusively upon his own doubts about the

evidence cited above, the court concludes that substantial

evidence does not support a finding that Hunter has failed to

establish the involvement of two organs or body systems, and

moderately severe involvement in one.

The ALJ's finding regarding the constitutional symptoms or

signs of systemic vasculitis is equally infirm.  To begin, it is

not clear how a claimant's ability to perform substantial

gainful activity before the alleged onset date of his claimed

disability sheds any light on the severity of his symptoms after

the alleged onset date.[11]  Viewed in the light most favorable to

the ALJ's decision, the evidence he cites to demonstrate

---

[11] Moreover, the ALJ's reliance upon Hunter's ability to
perform substantial gainful activity would seem to be undermined
by the fact that Hunter was discharged from his position at
Sears due to absences resulting from his HSP.

Hunter's "robust level of activities" shows, at most, that Hunter eats three meals a day, spends 20 minutes a day preparing sandwiches or leftovers, takes medication twice a day, watches television, feeds and walks two dogs with the help of his fiancée, and spends 40 to 60 minutes a week doing laundry and housekeeping.  That list of activities, in conjunction with Hunter's statements that he is "always exhausted and [doesn't] even want to get out bed on most days" and is "constantly sleeping" is not evidence a reasonable mind would accept as sufficient to support a conclusion that Hunter has failed to establish the constitutional symptoms of severe fatigue and malaise.[12]

Because the ALJ's determination that Hunter has failed to establish that his HSP satisfies the criteria stated in Listing 14.03, this matter should be remanded.

    2.   RFC Assessment

Hunter also claims that the ALJ made an RFC assessment that is not supported by substantial evidence.  Specifically, he

---

[12] Regarding another constitutional symptom or sign, there is no medical evidence of involuntary weight loss after June 2, 2012, the date on which Hunter claims to have become disabled, and if anything, the record demonstrates weight gain as a result of Hunter's use of the prednisone that was prescribed for his HSP.  However, there is evidence in the medical record that in February of 2012, the month in which he was hospitalized for vasculitis, Hunter lost ten pounds.  See Tr. 1898.

argues that the ALJ erred by failing to properly consider: (1)
Dr. Ciocca's opinion; (2) the combined effects of his physical
and mental impairments; (3) his recent mental-health treatment;
and (4) his low back pain.  Taken together, Hunter's first three
arguments describe an error by the ALJ that warrants a remand.

In his decision, the ALJ found Hunter to have an RFC that
included a limitation on his ability to focus, persist, and keep
pace, but he found no limitations resulting from an inability to
tolerate workplace stressors.  In Hunter's view, an RFC that
includes no stress-related limitation is not supported by
substantial evidence.  The court agrees.

In his Mental Health Evaluation Report, Dr. Ciocca
described Hunter's mood this way:

> Mr. Hunter's mood was generally euthymic.  He denied
> any current persistent depression, but reports that he
> does have some suicidal feelings due to his illness,
> his level of debt, and the fact that he is unemployed.
> He reports some lack of motivation which he attributes
> to his level of fatigue, and also reports some
> anhedonia.  There is significant hypersomnia.[13]

> The claimant denies any current anxiety or panic.  He
> does report chronic worry about money and about his
> illness.  He reports fluctuating appetite.

[13] Euthymia is defined as "[j]oyfulness; mental peace and
tranquility" or as "[m]oderation of mood, not manic or
depressed."  Stedman's, supra note 1, at 678.  Anhedonia is the
"[a]bsence of pleasure from the performance of act that would
ordinarily be pleasurable."  Id. at 93.  Hypersomnia is "[a]
condition in which sleep periods are excessively long, but the
person responds normally in the intervals, distinguished from
somnolence."  Id. at 926.

Tr. 1983 (emphasis added).  Dr. Ciocca also reported that
Hunter's "[t]hought content was largely focused on [his]
physical illness and symptoms."  Id.  Subsequently, Dr. Ciocca
opined that "Mr. Hunter is currently unable to tolerate
stressors common to the work situation, and to maintain
consistent attendance."  Tr. 1985.

     In his decision, the ALJ "gave little weight" to Dr.
Ciocca's opinion "because it was internally inconsistent."  Tr.
1663.  With respect to Dr. Ciocca's opinion that Hunter was
"unable to maintain attention and concentration in order to
persist at, and complete tasks," Tr. 1984, the ALJ's decision
would appear to be well-founded; in his examination notes, Dr.
Ciocca reported that Hunter's "memory, attention, and
concentration were within normal limits."  Tr. 1983.  But with
respect to Dr. Ciocca's opinion on Hunter's ability to tolerate
workplace stressors, the court reaches a different conclusion.

     The ALJ explained his rejection of Dr. Ciocca's opinion on
Hunter's ability to tolerate workplace stressors this way:

> [Dr. Ciocca] identified somewhat benign psychological
> signs and symptoms, yet concluded [that] the claimant
> would be . . . unable to tolerate workplace stressors
> . . . .  For example, as noted above, at the
> consultative examination, Dr. Ciocca noted "no
> abnormalities of gait, posture, or general
> appearance."  He stated that the claimant arrived on
> time; he appeared casually dressed; and he was "fairly
> well groomed."  He remarked [that] the claimant was

19

pleasant and cooperative.  Although his speech was
somewhat quiet and subdued . . . [it] was
[nevertheless] logical and spontaneous."  The
claimant's mood was described as "generally euthymic,"
and the claimant denied "any current persistent
depression."  While his affect was "somewhat flat" and
"somewhat limited," he was alert, and oriented to the
day, the date, and the time.  There was no evidence of
hallucinations.  In addition, the claimant's memory,
attention, and concentration were within normal
limits, and his intellect and fund of general
knowledge were estimated as average.  Simply stated,
the disabling level of limitations Dr. Ciocca opined
the claimant would be under is inconsistent with the
relatively benign psychological signs and symptoms
reflected in his report of his examination of the
claimant, so I gave it little weight.  Further, Dr.
Ciocca's conclusion [that] the claimant would be
unable to tolerate workplace stress stands in stark
contrast to the claimant's own statements that he
could handle stress, and adapt to changes in routine
"well."  I gave his opinion little weight because it
was contradicted by the claimant's somewhat robust
level of activities, his rather benign allegations of
limitations contained in his function report, his lack
of psychological treatment over the last year, and his
appropriate and capable presentation before me at the
hearing in this case.

Tr. 1663-64 (citations to the record omitted).

If Dr. Ciocca's opinion was inconsistent with or

unsupported by his clinical observations and findings, that

would be substantial evidence in support of the ALJ's decision

to discount that opinion.  See 20 C.F.R. §§ 404.1527(c) &

416.927(c).  Indeed, the ALJ's decision lists numerous

observations of Hunter that Dr. Ciocca included in his report.

But it is not readily apparent how Hunter's normal gait, fairly

good grooming, logical and spontaneous speech, or any of the

other things Dr. Ciocca observed, would be inconsistent with an inability to tolerate workplace stressors, and the ALJ does not explain the connections.  Thus, there is not substantial evidence to support the ALJ's determination that Dr. Ciocca's opinion on Hunter's ability to tolerate workplace stressors is inconsistent with his clinical observations and findings.

The ALJ also discounted Dr. Ciocca's opinion because it stood "in stark contrast to the claimant's own statements that he could handle stress, and adapt to changes in routine 'well.'" Tr. 1664.  Hunter made those statements the Function Report he filled out in July of 2012, shortly after he had lost his job. Dr. Ciocca rendered his opinion in September of 2012.  In November of 2012, the pressures of Hunter's physical illness, the loss of his job, financial problems, and a breakup with his fiancée resulted in his voluntary admission to the psychiatric unit at Concord Hospital.  As between Hunter's statement that he handled stress well and Dr. Ciocca's opinion, Dr. Ciocca's opinion would seem to have been the more prescient.  Plainly, the statements in Hunter's Function Report are not substantial evidence in support of the ALJ's decision to discount Dr. Ciocca's opinion.

The ALJ also stated that Dr. Ciocca's opinion was contradicted by Hunter's "somewhat robust level of activities."

Tr. 1664.  In his report, Dr. Ciocca described Hunter's present
daily activities this way:

> Mr. Hunter reports that he gets out of bed around
> 11 o'clock, has something to eat and takes his
> medication, then gets on the couch, watching TV, and
> falls asleep.  He has dinner and spends time with his
> fiancée, then falls asleep and goes to bed around nine
> or ten in the evening.  He reports that he lacks drive
> and motivation, and as a result, does not do any
> housework.  He states that he usually does not go out
> anywhere, and depends on his fiancée to shop and take
> care of their living space.  He denies socializing
> with anyone and reports that he is basically isolated.
> He does go down [to] Boston periodically for the
> treatment of his vasculitis.

Tr. 1983.  Leaving aside the question of whether the level of
activity that Dr. Ciocca described is "somewhat robust," the
court cannot see, and the ALJ does not explain, how Dr. Ciocca's
opinion on Hunter's ability to tolerate workplace stressors is
contradicted by the information he had on Hunter's daily
activities, or by the daily activities Hunter listed in his
Function Report, which are only modestly more ambitious than
those he later reported to Dr. Hunter.  As with the other
factors cited by the ALJ, Hunter's daily activities are not
substantial evidence supporting the ALJ's decision to discount
Dr. Ciocca's opinion on Hunter's ability to tolerate workplace
stressors.

The lack of substantial evidence to support the ALJ's
decision to discount Dr. Ciocca's opinion on Hunter's ability to

tolerate stress is a second reason to remand this matter for
further proceedings.  That said, the court notes, briefly,
several other meritorious issues raised by Hunter that should be
addressed on remand.

First, Hunter argues that the ALJ failed to consider the
combined effects of his HSP and his bipolar disorder.  The
applicable Social Security regulations provide that the SAA, and
by extension, an ALJ, "will consider the combined effect of all
of [a claimant's] impairments."  20 C.F.R. §§ 404.1523 &
416.923.  The Acting Commissioner contends that the ALJ did
consider the combined effects of Hunter's physical and mental
impairments, but the portions of the ALJ's decision that the
Acting Commissioner points to seem to be boilerplate recitations
of various SSA regulations rather than an actual consideration
of the effect of Hunter's HSP on his mental state.  However,
that specific issue is directly addressed in: (1) Dr. Ciocca's
opinion, see Tr. 1983, 1985; (2) Dr. Harris's mental RFC
assessment, see Tr. 1697, 1710; (3) the report generated upon
Hunter's admission to Concord Hospital, see Tr. 2002-03; (4) Dr.
Bice's initial progress note, see Tr. 1990; and (5) the report
generated upon Hunter's admission to SNHMC, see Tr. 2012, 2014.
Moreover, while the Acting Commissioner faults Hunter for
failing to demonstrate that the combined effect of his physical

23

and mental impairments causes work-related functional

limitations, Hunter explicitly argues that the ALJ erred in his

evaluation of Dr. Ciocca's opinion that his mental impairment

limits his ability to tolerate workplace stressors, and Dr.

Ciocca's opinion also expressly considered Hunter's physical and

mental impairments in combination.  That suffices to demonstrate

a work-related limitation caused by the combination of Hunter's

HSP and his bipolar disorder.  In short, the volume and the

specificity of the evidence directly linking Hunter's physical

impairment to his mental impairment, and linking the combined

effect of those impairments to an inability to tolerate

workplace stressors, merits more than a rote citation of

boilerplate language.

Second, Hunter argues that the ALJ failed to properly

consider his recent mental health treatment, i.e., his two

hospital admissions for psychiatric care and his course of

counseling with Bice.  The Acting Commissioner correctly points

out that the ALJ did mention Hunter's hospitalizations in his

decision.  But the manner in which he did so is problematic.  In

the section of his decision devoted to an assessment of the

credibility of Hunter's statements about his symptoms, the ALJ

says this:

> Although the evidence reflects [that] the claimant
> required two psychiatric hospitalizations for suicidal

and homicidal ideation . . . the record reflects
[that] these were due to a number of tangential
psychosocial stressors, like the loss of his job, his
breaking up with his girlfriend, and his having been
denied disability benefits.

Tr. 1662.  Given that there is no evidence that Hunter has

gotten a job, reunited with his girlfriend, or received

benefits, those stressors would all seem to remain in play, and

it is difficult to see what the ALJ meant by calling those

stressors "tangential."  Moreover, in light of the foregoing

discussion of the ALJ's treatment of Hunter's impairments in

combination, the court cannot help but note that the ALJ's list

of "tangential psychosocial stressors" omits any mention of his

HSP, despite explicit mention of that particular stressor in the

reports generated by both of Hunter's psychiatric admissions.

See Tr. 2003 ("This is a 48-year-old man with a lengthy history

of a successful business career, who has fallen upon much more

difficult times subsequent to learning of his kidney disease."),

2012, 2014 ("The patient apparently has had a longstanding

history of mood variability, complicated by alcohol abuse.  More

recently, his situation has been complicated by a diagnosis of

Henoch-Schonlein purpura and ongoing uses of prednisone.").  On

remand, Hunter's mental-health treatment should be considered in

a less dismissive manner.

## IV.  **Conclusion**

For the reasons detailed above, the Acting Commissioner's motion for an order affirming her decision, document no. 14, should be denied, Hunter's motion to reverse that decision, document no. 10, should be granted, and this matter should be remanded to the Acting Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).  The clerk of the court should be directed to enter judgment in accordance with this order and close the case.

Any objection to this report and recommendation must be filed within 14 days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file an objection within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to review by district court; issues not preserved by such objection are precluded on appeal).

_Andrea K. Johnstone_
Andrea K. Johnstone
United States Magistrate Judge

October 13, 2016

cc:  Laurie Smith Young, Esq.
     Terry L. Ollila, Esq.